**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GRUBHUB INC. and** | ) | |
| **TAKEAWAY.COM CENTRAL** | ) | |
| **CORE B.V.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 21 CV 5312** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| | ) | |
| **THE KROGER CO. and RELISH** | ) | |
| **LABS LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**To:    The Honorable Charles R. Norgle, Sr.
       United States District Judge**

## REPORT AND RECOMMENDATION

On July 29, 2021, plaintiff Grubhub Inc. unveiled its new branding mark at a concert in

Chicago.  Grubhub's new mark consists of a house symbol with a fork and a knife inside

combined as follows:  .  Defendant Relish Labs LLC d/b/a Home Chef ("Home

Chef") first learned of Grubhub's new mark on August 25, 2021, the day after Grubhub issued a

press release announcing its changed branding to its customers and the general public.  Home

Chef concluded that Grubhub's new mark impermissibly infringes on its own marks, which were

previously registered with the United States Patent and Trademark Office and appear as follows:

.  Home Chef sent Grubhub a cease-and-desist letter on September 7,

2021.  The parties thereafter attempted, albeit unsuccessfully, to resolve their dispute regarding the competing marks.

On October 7, 2021, Grubhub and co-plaintiff Takeaway.com Central Core (collectively "Grubhub" unless otherwise specified) initiated this declaratory judgment action pursuant to 28 U.S.C. §2201 against Home Chef and its co-defendant The Kroger Co. (collectively "Home Chef" unless otherwise specified).  Grubhub seeks a declaration that its continued use of its new branding mark neither infringes nor dilutes any of Home Chef's rights under the Lanham Act, 15 U.S.C. §1051 *et. seq.*, nor constitutes unfair competition and/or a false designation of origin under the Lanham Act and state common law.  (Dckt. #40).  In response, Home Chef filed an answer and asserted counterclaims alleging that Grubhub unlawfully infringed and diluted its trademarks in violation of the Lanham Act and Illinois statutory and common law, and that Grubhub's actions constituted unfair competition and deceptive trade practices in violation of Illinois law.  (Dckt. #16).

On November 3, 2021, Home Chef also filed a motion for a preliminary injunction, which was subsequently referred to this Court by the District Court.  (Dckt. #17, 34).  In its

motion, Home Chef seeks an order enjoining Grubhub from using the following mark: and any similar variation thereof, in any and all advertising, promotions, and marketing.  The parties briefed the motion and submitted evidence in the way of affidavits and documents, after which the Court held a hearing and heard argument from counsel.  (*See* Dckt. #56 – 1/6/22 Hr'g Transcript).  The following represents this Court's recommended proposed findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 72(b)(1).  For the reasons discussed in detail below, this Court respectfully recommends that the District Court grant Home Chef's motion for preliminary injunction.

## I.      FINDINGS OF FACT

The facts pertinent to the resolution of this motion are largely undisputed.  The Court relies on the parties' submissions, their pleadings,[1] and any other source from which it is appropriate to take judicial notice.

### A.      The Parties

#### 1.      Home Chef

##### a.      History, Scope of Operations, and Current Product Offerings

Home Chef was founded in 2013 by current CEO Patrick Vihtelic.  It currently offers its customers more than 500 products including meal kits, heat-and-eat meals, ready-to-eat products, and seasonal meals.  (Dckt. #18-1 at ¶¶1-2, 15 – Decl. of CEO Patrick Vihtelic).   Vihtelic, who started Home Chef in his Chicago apartment with his personal savings, set out "to provide everything needed to bring more delicious, healthy and varied meals" to families throughout the United States, "as a convenient and low-cost alternative to grocery shopping."  (Dckt. #18-1 at ¶2).  To do so, Vihtelic partnered with a local executive chef to design recipes for at-home meal preparation.  (*Id*. at ¶4).  Home Chef first launched its meal kit delivery service – which provided the delivery of "fresh, pre-portioned ingredients and easy-to-follow recipes" – in 2014.  (*Id*. at ¶5).  It opened its first distribution center in Chicago in October 2015 and by June 2015, Home Chef was delivering 10,000 boxes of meal kits per month.  (*Id*. at ¶¶5-6).

Home Chef's meal kit business continued to grow significantly over the next few years. By February 2017, Home Chef had opened two additional distribution centers, was delivering 2.5 million meals per month to over 97% of the country, and employed more than 800

---

[1] *See, e.g., Prudential Insurance, Co. v. Newman*, No. 17 C 8732, 2019 WL 4750014, at *9 n.13 (N.D.Ill. Sept. 30, 2019) (citing cases and noting that a court has the right to take notice of pleadings within its own files).

employees. (Dckt. #18-1 at ¶8; Dckt. #18-2 at p. 32).[2] Home Chef grew 150% in 2017, bringing in $250 million in revenue. (Dckt. #18-1 at ¶10; Dckt. #18-2 at p. 35). Since at least 2018, Home Chef has enjoyed the highest rate of customer satisfaction amongst companies who sell meal kits. (Dckt. #18-1 at ¶30).

In June 2018, Home Chef finalized a merger with grocery retailer the Kroger Co. ("Kroger"), which has 2,800 retail food stores nationwide under a variety of banner names, including Mariano's in Illinois. (Dckt. #18-1 at ¶¶10, 16; Dckt. #18-2 at pp. 35-36, 43). Home Chef decided to pursue the merger to "further expand the company's availability and trade channels by making its products available through Kroger family retail grocery stores nationwide." (Dckt. #18-1 at ¶10; Dckt. #18-2 at p. 35). Home Chef also decided to expand its range of product offerings beyond meal kits. Specifically, in October 2018, Home Chef started providing a new line of in-store "Home Chef *Express*" products "featuring quick-cook meal kits ready to eat in 15 minutes," to "address a major customer need – faster meals." (Dckt. #18-1 at ¶11; Dckt. #18-2 at p. 44). By 2019, Home Chef was offering its "Ready-to-Cook" and "Ready-to-Eat" meal options in more than 2,100 Kroger family stores nationwide with double digit growth in the fresh meal category. (Dckt. #18-1 at ¶12; Dckt. #18-2 at p. 64).

Currently, Home Chef offers hundreds of products, including meal kits, heat-and-eat meals, and ready-to-eat options. (Dckt. #18-1 at ¶15). Representative samples of the heat-and-eat and ready-to-eat meals include Home Chef's heat-and-eat soups (listed for $5.99 and under), heat-and-eat pasta dishes (listed for $7.99), and varieties of Home Chef's ready-to-eat rotisserie and fried chicken, available "hot" (listed for $7.99 and under). (Dckt. #18-7 at pp. 162-65 –

---

[2] Throughout this Report and Recommendation, citations to specific page numbers refer to the CM/ECF page numbers indicated at the top of each page.

Printout from Kroger's website dated 10/29/21; Dckt. #18-8 at pp. 134-36 – Printout from Instacart's website dated 11/1/21).

Home Chef's products can be purchased through Home Chef's website and mobile application, Kroger's website and mobile application, and in 2,000 Kroger family stores, either for pick up or delivery. (*Id.* at ¶16). Since 2021, Home Chef has also partnered with meal delivery service DoorDash – a Grubhub competitor – to "promote and sell Home Chef's meal kits and prepared meals for pickup and home delivery throughout select Kroger family stores." (Dckt. #18-3 at ¶34 – Decl. of Senior Director of Brand Marketing Shira Schwarz; Dckt. #18-5 at p. 140 (advertisement promoting delivery of Home Chef's prepared chicken by Door Dash)). Customers can also order Home Chef's meal kits, heat-and-eat, and ready-to-eat meals for pick up and home delivery from Kroger through Instacart, another grocery and meal delivery service. (*Id.* at ¶35; Dckt. #18-8 at pp. 134-36). In addition, select customers can order Home Chef vouchers directly through the Grubhub mobile app for redemption on the Home Chef website. (Dckt. #18-8 at pp. 173, 183-86, 190 (Auburn University articles advising students how to order Home Chef vouchers through the Grubhub app);[3] Dckt. #39 at ¶¶72-73 (Grubhub's answer to Home Chef's counterclaims)).

Home Chef's annual sales, which were $250 million at the time of its merger with Kroger in 2018, have now reached $1 billion as of October 25, 2021. (Dckt. #18-1 at ¶¶10, 13; Dckt. #18-2 at pp. 35-36, 121).

---

[3] One college student reported that she first learned of Home Chef from the Grubhub app. (Dckt. #18-8 at p. 184); *see Mechling v. Operator of Website Muaythaifactory.com*, No. 21-CV-01538, 2021 WL 3910752, at *1 (N.D.Ill. Sept. 1, 2021) (noting that courts can consider hearsay at the preliminary injunction stage).

b.    **Home Chef's Branding**

To strengthen Home Chef's brand identity and to distinguish it from its competitors, Vihtelic commissioned a design company to develop a design suggestive of and consistent with the HOME CHEF name and word mark.  (Dckt. #18-1 at ¶19).  In 2014, Home Chef selected the following design (hereinafter, the "HC House Mark"):



(Dckt. #18-1 at ¶¶19-20).  Home Chef owns federal registrations with the United States Patent and Trademark Office ("USPTO") for the HOME CHEF word mark (Registration Nos. 5609384, 5811449, and 5362224), the HC House Mark alone (Registration Nos. 5241586, 5294674, and 5786784), and the HC House Mark with the HOME CHEF word mark (Registration Nos. 5609448 and 5598365).  (Dckt. #18-1 at ¶¶18, 22; Dckt. #18-2 at pp. 137-152).

Home Chef publicized the HC House Mark in 2014 and thereafter used the mark – both with and without its registered HOME CHEF word mark  – on its website, on its various social media pages, and to advertise its products and services – including its meal kits, heat-and-eat meals, and ready-to-eat products – through a wide array of marketing channels.  (Dckt. #18-1 at ¶¶20-21, 23; Dckt. #18-3 at ¶¶2-3).  The HC House Mark combined with the HOME CHEF word mark appears as follows:



(Dckt. #18-1 at ¶¶23, 30). Though often used in green (as shown above), Home Chef uses the HC House Mark in a wide variety of colors, including orange. (Dckt. #18-1 at ¶21; Dckt. #18-3 at ¶¶15-16; Dckt. #18-4 and #18-5 (including hundreds of examples of Home Chef's use of the HC House Mark, both alone and with the word mark, in many different colors)).

Home Chef also uses its HC House Mark in numerous partnerships and co-branding efforts with celebrity chefs (*e.g.*, Gina Homolka and her brand Skinny Taste), popular influencers (*e.g.*, Olympic gymnast Shawn Johnson), charities (*e.g.*, Feeding America), businesses (*e.g.*, Heinz, Impossible Burger), and other well-known brands. (Dckt. #18-3 at ¶¶17-29; Dckt. #18-4 and #18-5 (showing extensive use of the HC House Mark in partnership advertisements)). Moreover, according to Home Chef's Senior Director of Marketing, "Home Chef often promotes its products and services as a convenient, low-cost alternative to restaurant takeout, including by comparing its services with restaurant delivery." (Dckt. #18-3 at ¶33; Dckt. #18-5 at pp. 132-38).

Since its launch in 2014, Home Chef has spent more than $450 million on marketing and advertising to promote its products and services. (Dckt. #18-3 at ¶4). Home Chef's advertising reaches a nationwide audience of many millions of customers each day and it regularly airs commercials through television and cable broadcasting networks (including ABC, NBC, FOX, A&E, AMC, BBC America, Bravo, Cooking, Discovery, E!, and Food Network, amongst others) and various online video streaming platforms. (Dckt. #18-3 at ¶¶5, 12-13). Home Chef has accumulated hundreds of thousands of followers on social media sites, including Facebook (more than a half million followers), Instagram (218,000 followers), Pinterest (23,000 followers), and Twitter (12,000 followers). (Dckt. #18-3 at ¶¶7-9, 11). In addition, Home Chef's YouTube channel has had more than 84 million views since July 7, 2014. (Dckt. #18-3 at ¶10).

2.      **Grubhub**

a.      **History and Scope of Operations**

Founded in 2004, Grubhub – which proclaims itself to be one of the "most well-known

brands in the United States" – is a "leading online food-ordering and delivery marketplace"

dedicated to providing its customers with food from local restaurants.  (Dckt. #40 at ¶7; Dckt.

#46-4 at ¶¶ 3-4 – Decl. of Grubhub's Senior VP of Growth Ariella Kurshan).  Grubhub's

marketplace includes more than 300,000 restaurant partners in over 4,000 U.S. cities and

provides food to Grubhub's 32 million active diners.[4]  (Dckt. #46-4 at ¶¶5-6).  In 2020, Grubhub

provided nearly $9 billion in gross food sales to local restaurants, and it processed more than

745,000 restaurant orders per day.  (Dckt. #46-4 at ¶ 6).  Grubhub also provides tools and

services to restaurants aimed at growing their digital presence and increasing their business.

(Dckt. #46-4 at ¶ 7).  In addition to working with restaurants, Grubhub provides meal delivery

services through other channels, including grocery stores.  (Dckt. #39 at ¶ 58; Dckt. #46-4 at pp.

95-98).

Since its inception, Grubhub has expanded by acquiring a number of different food

delivery brands, many of which operate under Grubhub's "portfolio of brands."  (Dckt. #18-9 at

p. 115 and at pp. 76-106 (press releases describing Grubhub's various acquisitions)).  One of

those brands is Grubhub's "well-known" Seamless brand, which is primarily focused in the

greater New York City area but serves a number of other major U.S. cities including Chicago,

Los Angeles, Washington DC, Houston, Seattle, and Miami, and offers delivery services similar

to those provided by Grubhub.  (Dckt. #40 at ¶9; Dckt. #56 at pp. 11, 13; Dckt. #18-9 at p. 84).

Although it was acquired by Grubhub in 2013, Seamless still maintains its own online platform

---

[4] "Active diners" are those diners who have used the Grubhub platform within the past twelve months.
*See Azar v. Grubhub, Inc.*, No. 1:19-cv-07665, 2021 WL 4077327, at *2 n.4 (N.D.Ill. Sept. 7, 2021).

and mobile app via which customers can order food from restaurants for delivery and pickup.
(Dckt. #40 at ¶9; Dckt. #56 at pp. 11, 13; Dckt. #18-9 at p. 37 (characterizing Seamless as
"Grubhub's sister app")).  Nonetheless, Grubhub does not separately track the business generated
by Seamless and it views its overall business as a single business.  (Dckt. #56 at p. 13).

In 2019, Grubhub generated revenues of $1.312 billion and had gross assets of $2.375
billion.  (Dckt. #18-9 at p. 115).  Grubhub's revenue, per its 2020 Annual Report, increased by
more than $500 million to $1.8 billion for the year ending December 31, 2020.[5]

### b.    Branding Prior to August 2021

Through its subsidiary, Grubhub owns numerous registrations for its GRUBHUB and
SEAMLESS trademarks with the USPTO.  (Dckt. #46-4 at ¶11 and pp. 13-22; Dckt. #40 at ¶12).
Prior to August 2021, Grubhub had "long-used" the following "famous, and well-known" logo
format and color:



(Dckt. #46-4 at ¶10; Dckt. #40 at ¶¶1, 10).  For its Seamless brand, Grubhub used the following
logo and color scheme:



---

[5] Grubhub's 2020 Annual Report is accessible through its website, to which the parties have cited.  (*See*
https://s2.q4cdn.com/772508021/files/doc_financials/2020/ar/2020-Annual-Report.pdf ).  Where, as here,
the parties refer to a party's website in their briefing, "the district court may take judicial notice of the
entire contents of that website."  *James v. City of Evanston*, No. 20-CV-00551, 2021 WL 4459508, at *7
n.3 (N.D.Ill. Sept. 29, 2021) (citing *Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018); *Cassell
v. Snyders*, 458 F.Supp.3d 981, 990 (N.D.Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) (same); *see also
In re Am. Apparel, Inc. S'holder Derivative Litig.*, No. CV 10-06576 MMM RCX, 2012 WL 9506072, at
*18 (C.D.Cal. July 31, 2012) (taking judicial notice of party's annual reports and other documents
publicly filed with the SEC).

(Dckt. #40 at ¶11).

### 3.  Takeaway.com Central Core B.V. (JET)

#### a.  History and Scope of Operations

Plaintiff Takeaway.com Central Core B.V. ("JET") was founded in 2000 and is based in the Netherlands.  (Dckt. #46-5 at ¶4 – Decl. of JET's Chief Marketing Officer Maurine Alma); Dckt. #1 at ¶13).  JET, along with its group companies (the "JET Group"),[6] is a "leading global online food ordering and delivery marketplace" that connects consumers and restaurants through its platform in twenty-five countries throughout Europe and South America, as well as in Canada, Australia, New Zealand, and Israel.  (Dckt. #46-5 at ¶¶3, 5).  JET has also expanded its delivery operations to include grocery stores and it identifies Kroger as one of its "current partner[s]" within its network.  (Dckt. #46-4 at pp. 96-97, 98, 99; Dckt. #56 at pp. 51-52).

#### b.  Global Branding

As early as June 2014, JET has used the following logo (hereinafter, the "JET House Logo") in connection with its food ordering and delivery services:



(Dckt. #46-5 at ¶6).  JET has "displayed the mark prominently in all of its publicly-facing marketing and advertising materials, including its publicly available websites at www.takeaway.com, on the various country-specific websites through which it conducts business, through its various social media accounts, and together with its specific business names more generally throughout the 25 countries in which it provides its services."  (*Id*.).  Moreover, JET uses the JET House Logo in each country in which it operates by "combining the [JET

---

[6] For simplicity, the Court will hereafter refer to JET and the JET Group as "JET."

House Logo] with a word mark that is specifically known in the particular country," *e.g.* "Just

Eat" or "Takeaway.com." (*Id*. at ¶7). JET's "single-brand identity is efficient because JET is

able to concentrate its marketing efforts around a single brand." (Dckt. #40 at ¶15). The

following graphic demonstrates JET's use of the JET House Logo across the various countries in

which it does business:



(Dckt. 46-5 at ¶7). JET owns at least eight International Trademark Registrations with the World

Intellectual Property Office for the JET House Logo alone and for trademarks that include the

logo, in addition to owning trademark registrations in other regions and countries outside the

United States. (*Id*. at ¶8).

B.   **Timeline of Relevant Events**

   1.   **JET Announces its Acquisition of Grubhub and Files a USPTO Application for the JET House Logo Alone**

In a press release dated June 10, 2020, JET announced that it had reached a deal to acquire Grubhub and "create the world's largest online food delivery company outside of China." (Dckt. #18-9 at p. 109). Just a few weeks later, on July 1, 2020, JET filed a trademark application with the USPTO for the JET House Logo alone, with no accompanying word mark. (Dckt. #18-7 at pp. 223-25; Dckt. #46-5 at ¶15; Dckt. #39 at ¶5).

On January 6, 2021, the USPTO issued a nonfinal notice of provisional refusal which refused JET's application for the JET House Logo, stating: "Registration of the applied-for mark is refused because of a likelihood of confusion with [Home Chef's] marks in U.S. Registration Nos. 5241586, 5294674, 5598365, 5609448." (Dckt. #18-8 at p. 3; Dckt. #39 at ¶7). In short, the USPTO found a likelihood of confusion between: (1) the JET House Logo and Home Chef's registered marks for the HC House Mark standing alone (Registration Nos. 5241586 and 5294674); *and* (2) the JET House Logo and the HC House Mark combined with the Home Chef word mark (Registration Nos. 5598365 and 5609448). Specifically, the USPTO examiner compared the JET House Logo to the HC House Mark and noted that the marks are:

> comprised of a single fork and a single knife within the inside of a house design. In addition, the positioning of the fork and knife are both the same with both the fork and knife facing in the same direction and with the fork being on the left and the knife on the right.

(Dckt. #18-8 at p. 5). Furthermore, when comparing the JET House Logo to the HC House Mark *with* the accompanying Home Chef word mark, the USPTO examiner found that the JET House Logo "is likely to appear to prospective purchasers as a shortened form of registrant's mark." (*Id.*). Accordingly, the examiner concluded that the JET House logo and Home Chef's registered

marks (both with and without the accompanying Home Chef word mark) were "confusingly

similar." (*Id.*). The examiner also compared the goods and services offered by the parties – as

described in the application and registrations at issue and as evidenced by various internet

findings – and found them to be related. (Dckt. #18-8 at pp. 5-6).

Ultimately, the USPTO examiner concluded as follows:

> In total, the marks create the same commercial impression and the evidence shows
> that the goods and/or services are commercially related and likely to be encountered
> together in the marketplace by consumers. Upon encountering applicant's mark
> and the registered marks, consumers are likely to be confused and mistakenly
> believe that the respective goods and/or services emanate from a common source.
> Therefore, registration must be refused based upon Trademark Act Section 2(d).

(Dckt. #18-8 at p. 6). In issuing the notice of provisional refusal, the USPTO informed JET that

it must provide its response within six months, or the application would be considered

abandoned. (*Id.* at 2). On August 9, 2021, JET filed with the USPTO a "renunciation" (*i.e.*,

withdrawal) of its application for the JET House Logo. (Dckt. #39 at ¶11). On August 29, 2021,

the USPTO acknowledged JET's August 9, 2021 renunciation of its application for the JET

House Logo and declared it abandoned. (Dckt. #39 at ¶14).

## 2. JET Completes its Acquisition of Grubhub and Rolls Out New Branding in the United States.

On June 15, 2021, JET completed its acquisition of Grubhub. (Dckt. #46-4 at ¶12; Dckt.

#18-9 at p. 122). In a press release about the acquisition, JET proclaimed that the "new company

is the market leader in Europe, Canada and Australia, with very strong positions in the most

important markets in the United States." (Dckt. #18-9 at p. 122). In an effort to combine the

"brand identities of JET and Grubhub into a single trademark for use in the United States,"

Grubhub combined the JET House Logo and the GRUBHUB trademark (now in orange instead

of red) to create the following two versions of its new U.S. logo (hereinafter, "the Grubhub Lock-up Logo"):



 (Dckt. #46-4 at ¶¶13-14).  According to Grubhub's VP of Growth, the Grubhub Lock-up Logo is "a cornerstone aspect of Grubhub and the JET Group's business strategy" because it "aligns the look and feel of the GRUBHUB brand with the JET Group's global branding to create consistency and streamline global marketing efforts."  (Dckt. #46-4 at ¶25; Dckt. #46-5 at ¶11). Similarly, for Seamless, Grubhub combined the JET House Logo with the Seamless word mark to create the following mark (hereinafter, the "Seamless Lock-up Logo"):



(Dckt. #40 at ¶19).  Although Grubhub announced following its merger with JET that it planned to "phas[e] out its use of any trademarks containing the SEAMLESS trademark as part of a single brand strategy for the United States," Seamless continues to use the Seamless Lock-up Logo to the present day.  (Dckt. #40 at ¶20; Dckt. #46-4 at pp. 27-28; Dckt. #56 at p. 11).

Grubhub unveiled its new Grubhub Lock-up Logo at a large music festival in Chicago on July 29, 2021.  (Dckt. #46-4 at ¶16).  On August 24, 2021, Grubhub rolled out its new branding on a broader scale, including updating its mobile application and website with the Grubhub Lock-up Logo, and issuing press releases to update its customers.  (Dckt. #46-4 at ¶17; Dckt. #39 at ¶13).  In its August 24, 2021 press release, which is titled "Grubhub Goes Orange," Grubhub states:

> Don't get caught doing a double take when you reach for the Grubhub app today. It's not your eyes – we've officially jumped in feet first to our new orange branding and logo!  As we announced last month, we're joining the Just Eat Takeaway.com

> (JET) family with our new look, and today's the day you'll see a lot more of our new citrus-colored branding throughout our app, website, and most anywhere else you find the Grubhub logo.

(Dckt. #46-4 at p. 29).

### 3. Home Chef Issues a Cease-And-Desist Letter to Grubhub

Home Chef learned of the rollout of the Grubhub Lock-up Logo on August 25, 2021, after its Senior Director of Brand Marketing read Grubhub's August 24, 2021 press release. (Dckt. #18-3 at ¶38). Two weeks later, on September 7, 2021, Home Chef sent Grubhub a cease-and-desist letter asserting that Grubhub's use of the JET House Logo in the United States infringed on Home Chef's trademark rights in violation of the Lanham Act. (Dckt. #40-1). In its letter, Home Chef described its business activities to Grubhub as follows:

> Home Chef offers a full scope of services to support at-home meal preparation, including providing chef-inspired recipes, meal preparation instructions and direct to consumer delivery of the necessary meal kit ingredients. The home delivery services are available throughout the United States. In addition to its meal kit preparation and delivery service, Home Chef sells pre-made, pre-packaged food kits, ready to eat or for at-home cooking or assembly as a meal, through Kroger stores throughout the country.

(*Id*. at p. 1). Home Chef then informed Grubhub of its belief that the Jet House Logo was "virtually identical and confusingly similar" to Home Chef's mark and that Grubhub was using the JET House Logo "for services that are closely related to Home Chef's services - both involving meal ordering and delivery services . . . ." (Dckt. #40-1 at p. 4). Home Chef demanded that Grubhub immediately cease its use of the JET House Logo.

Following Grubhub's receipt of the cease-and-desist letter, the parties briefly engaged in settlement discussions, with Grubhub offering to only use the JET House Logo with the GRUBHUB word mark and never alone. (Dckt. #40-2). Home Chef declined this proposal and Grubhub initiated this declaratory judgment action on October 6, 2021. On November 3, 2021,

Home Chef answered the complaint, filed its own counterclaims, and filed its motion for preliminary injunction (Dckt. #17) seeking an order barring Grubhub's use of the JET House Logo. The parties have fully briefed the motion and participated in an extended oral argument on January 6, 2022.

## II. STANDARD FOR PRELIMINARY INJUNCTION

"A preliminary injunction is a very serious remedy, 'never to be indulged in except in a case clearly demanding it.'" *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000), *quoting Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184 (7th Cir. 1989). To decide whether a preliminary injunction is warranted, courts in the Seventh Circuit engage in a two-step inquiry involving a threshold phase and a balancing phase. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1128 (N.D.Ill. 2019). First, the moving party (Home Chef) has the burden of making a threshold showing that (1) it is likely to succeed on the merits; (2) traditional legal remedies would be inadequate; and (3) it will suffer irreparable harm absent a preliminary injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021).

With respect to the likelihood of success on the merits, the Seventh Circuit has made clear that the moving party "need not show by a preponderance of the evidence that [it] will win [its] suit." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021)). Nonetheless, "the mere possibility of success is not enough" and the movant must instead "make a 'strong' showing on the merits." *Id.*; *see also Life Spine, Inc.*, 8 F.4th at 539 ("We recently clarified that a plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance.") (internal quotation marks omitted). "The precise showing necessary 'depends on the facts of the case at hand because of

the [Seventh Circuit's] sliding scale approach.'" *Life Spine, Inc.*, 8 F.4th at 540, *quoting Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020).

If the moving party makes the threshold showing, the court moves to the balancing phase where the court "weighs the harm of denying an injunction to the [movant] against the harm to the [opposing party] of granting one." *Life Spine, Inc.*, 8 F.4th at 549 (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). "The Seventh Circuit has described this balancing test as a sliding scale: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win, the more that balance would need to weigh in its favor." *Mechling v. Operator of Website Muaythaifactory.com*, No. 21-CV-01538, 2021 WL 3910752, at *2–3 (N.D.Ill. Sept. 1, 2021) (internal quotation and citation omitted). The sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *SFG, Inc. v. Musk*, No. 19-CV-02198, 2019 WL 5085716, at *15 (N.D.Ill. Oct. 10, 2019), *quoting Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896 (7th Cir. 2001). In balancing the harms, the court also considers the public interest in granting or denying the injunction. *Life Spine, Inc.*, 8 F.4th at 539; *Ty*, 237 F.3d at 895. In doing so the "question is not whether the public interest will be served, but whether the public interest will be *dis*served" if the injunction is granted. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 866–68 (7th Cir. 1983) (emphasis in original).

From a procedural standpoint, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1119 (7th Cir. 1997) (citation omitted); *Mechling*, 2021 WL 3910752, at *1. Furthermore, courts can consider

hearsay at the preliminary injunction stage and Federal Rule of Civil Procedure 65(a) does not require an evidentiary hearing, particularly where (as here) the response to a motion for preliminary injunction fails to create a genuine issue of material fact. *Mechling*, 2021 WL 3910752, at *1 (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 653–54 (7th Cir. 2003)).

With this standard in mind, the Court turns to its analysis, beginning with whether Home Chef has shown a likelihood of success on the merits.

## III. ANALYSIS

### A. Home Chef Has Demonstrated That It Is Likely to Succeed on the Merits of a Claim for Trademark Infringement

Home Chef's claims for trademark infringement arise under the Lanham Act, 15 U.S.C. §1051 *et. seq.* The Lanham Act provides in relevant part that a plaintiff may bring a civil action against:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity by another person.

15 U.S.C. §1125(a)(1). "The Lanham Act extends to 'the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin.'" *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 322 (3d Cir. 2015), *quoting Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir. 2004).

As the parties agree, in order to succeed on its claim for trademark infringement, Home Chef must show (1) that it owns a valid, protectable trademark; and (2) a likelihood of confusion caused by Grubhub's use of its mark. *Barbecue Marx, Inc.*, 235 F.3d at 1043; *Mechling*, 2021 WL 3910752, at *3. Here, the parties do not dispute that Home Chef's HC House Mark is valid

and protectable under the Act.  Accordingly, the Court turns to the disputed issue of whether Home Chef has established a likelihood of confusion.

"Likelihood of confusion exists when consumers viewing a mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F.Supp.2d 834, 847 (D. Del. 2006).  Consumer confusion, "need not be restricted to a mistake regarding the source of the goods; the court should also consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Nike, Inc. v. Just Did It Enterprises*, 6 F.3d 1225, 1228–29 (7th Cir. 1993).

Trademark confusion is often discussed in terms of two different theories of confusion: "forward confusion" and "reverse confusion."  *See, e.g., Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436–37 (7th Cir. 1999); *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 64–65 (1st Cir. 2013).  Forward confusion occurs:

> when customers mistakenly think the junior user's goods or services are from the same source or are connected with the senior user's goods or services.  In such a case, the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product.

*Johnny Blastoff, Inc.*, 188 F.3d at 436 (internal quotation marks omitted); *Dorpan*, 728 F.3d at 64–65.  Reverse confusion, on the other hand, occurs:

> when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user.  In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark.  Nonetheless, the senior user is injured because [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected with the latter.  The result is that the senior user loses the value of the trademark – its product identity, corporate identity, control over its good will and reputation, and ability to move into new markets.

*Johnny Blastoff, Inc.*, 188 F.3d at 436–37 (internal quotation marks omitted); *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995); *Dorpan*, 728 F.3d at 65.  Allegations of forward confusion and reverse confusion "do not form distinct claims"; rather, "they are alternative theories that can be used separately or together in a trademark infringement claim under the Lanham Act." *Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F.Supp.3d 1253, 1265 n.6 (N.D.Fla. 2016) (internal quotation marks omitted).  Here, Home Chef asserts that Grubhub's use of the Grubhub Lock-up Logo has resulted in both forward and reverse confusion.

In the Seventh Circuit, courts consider the following seven factors when determining whether a likelihood of confusion exists: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to pass his product off as that of another. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015); *Barbecue Marx, Inc.*, 235 F.3d at 1043–44.  Likelihood of confusion is a question of fact, *Dorpan*, 728 F.3d at 64, and the court must "weigh the evidence pertaining to each likelihood of confusion factor and balance the seven factors against each other." *Barbeque Marx, Inc.*, 235 F.3d at 1044.  No single factor is dispositive, "and the weight accorded to each factor will vary from case to case." *Smith Fiberglass Prod., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329–30 (7th Cir. 1993).

### 1.    The Similarity Between the Parties' Marks

Home Chef asserts that the parties' marks are confusingly similar based on a comparison of the marks and the USPTO's finding to the same effect.  (Dckt. #18 at pp. 12–13; Dckt. #47 at pp. 8–12).  Grubhub, for its part, denies that there is any similarity between the marks because there are certain stylistic differences between them.  (Dckt. #46 at p. 22).  Grubhub further

asserts that "the well-known and famous GRUBHUB brand *always* appears with the **JET House logo**, precluding *any* confusion that might arise between the respective marks." (*Id.*) (emphasis in original) (citing cases).

The Court, as the parties agree, must compare the parties' "marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 931 (7th Cir. 2008) (internal quotation marks omitted). The parties further agree that their marks are not encountered side-by-side in the marketplace. (Dckt. #18 at p. 12; Dckt. #46 at pp. 20–21). "To determine whether two marks are similar, [courts] view the marks as a whole" without dissecting them into their component parts and do not "'focus on minor stylistic differences to determine if confusion is likely' when the marks are not usually encountered together." *AutoZone*, 543 F.3d at 930, *quoting Meridian Mut. Ins. Co*, 128 F.3d at 1115; *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 515 (N.D.Ill. 2011). Indeed, "'the inability to compare the [marks] side-by-side and observe the precise difference in appearance may *increase* the likelihood of confusion.'" *Easton v. Primal Wear, Inc.*, No. 17-CV-06081, 2019 WL 1430985, at *6 (N.D.Ill. Mar. 29, 2019), *quoting Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988) (emphasis added in *Easton*).

Ultimately, "'[t]he test is not whether the public would confuse the *marks*, but whether the viewer of the accused mark would be likely to associate the product or service with which it is connected with the source of the products or services with which an earlier mark is connected.'" *AutoZone*, 543 F.3d at 930, *quoting James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976) (emphasis in original). The Court "should therefore 'consider whether the customer would believe that the trademark owner sponsored, endorsed or was

otherwise affiliated with the product'" of the assertedly infringing party. *Id., quoting Nike, Inc.*, 6 F.3d at 1228–29; *Allison Transmission, Inc. v. Fleetpride, Inc.*, No. 116CV02455LJMMJD, 2017 WL 1282994, at *3 (S.D.Ind. Apr. 5, 2017) (same).

In this case, the parties' respective marks (namely, the HC House Mark  and the

JET House Logo  ) share common elements:  in particular, both feature a fork on the left with tines facing up and a knife on the right with the edge facing left.  Moreover, given the fact that the marks are not encountered side-by-side in the marketplace, the minor stylistic differences in the shape of the house figures and the fact that the marks often – but not always – appear in different colors[7] are of far less significance and do not defeat the similarity created by the marks' common elements.  *See, e.g., AutoZone*, 543 F.3d at 930; *Facebook, Inc. v. Teachbook.com LLC*, 819 F.Supp.2d 764, 780–81 (N.D.Ill. 2011); *see also Meridian Mut. Ins.*, 128 F.3d at 115 (noting it is "inappropriate" to focus on "minor stylistic differences" when marks are not encountered together).

In reaching this conclusion, the Court also relies on the findings of the USPTO Examiner, who likewise determined that: (1) the design of the Jet House Logo and the HC House Mark are "highly similar"; and (2) that Jet's proposed mark (the Jet House Logo) was "confusingly similar" to Home Chef's registered marks (both the HC House Mark *and* the HC House Mark combined with the Home Chef word mark).  (Dckt. #18-8 at p. 5).  Although the USPTO

---

[7] Home Chef has registered the HC House Mark without claiming color and it uses the mark in a variety of colors, including orange – the color which Grubhub uses with the JET House Logo.  (Dckt. #18-3 at ¶16 (showing examples of Home Chef's use of orange with the HC House Mark); Dckt. #1 at ¶21).

Examiner's findings do not represent a final determination of the USPTO, courts have recognized that the USPTO "has expertise on the issue of likelihood of confusion"[8] and they "accord weight to the initial conclusions of the USPTO, in light of the expertise of the trademark examiners." *Limited. v. Macy's Merch. Grp. Inc.*, No. 15-CV-3645 KMW, 2016 WL 4094913, at *12 n.4 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 Fed.Appx. 633 (2d Cir. 2017) (internal quotation marks omitted); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997) (giving weight to the initial conclusions of the USPTO) (citing cases); *D.M. & Antique Imp. Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1274 (S.D.N.Y. 1969) (citing to the USPTO examiner's finding that the mark in question was "likely to cause confusion" in support of the court's conclusion that there was a likelihood of confusion between the competing marks).

Finally, for three reasons, the Court rejects Grubhub's assertion that any confusion that might be created by the similarity between the HC House Mark and the JET House Logo is neutralized because the GRUBHUB brand name "*always* appears with the **JET House Logo**." (Dckt. #46 at p. 22) (emphasis in original).

First, even if it were accurate to say that the GRUBHUB brand name "always" appears with the JET House Logo (which it is not, as explained below), it is undisputed that Home Chef makes frequent use of the HC House Mark *without* the HOME CHEF word mark in advertising and marketing materials. (Dckt. #18-3 at ¶15; Dckt. #18-4 at pp. 23-26, 28-30, 32-48, 50, 53-56, 58-64, 66-67, 72-74, 76-79, 81-85, 87-93, 96-98; Dckt. #56 at p. 39). When the USPTO examiner compared the JET House Logo (which had yet to be combined with the GRUBHUB word mark) to the HC House Mark *with* the Home Chef word mark, the examiner found that the

---

[8] *Vickery Design, Inc. v. Aspen Bay Co., Inc.*, No. CV 96-25 JP/DJS, 1998 WL 36030577, at *8 (D.N.M. July 16, 1998), *aff'd,* 185 F.3d 876 (10th Cir. 1999).

JET House Logo "is likely to appear to prospective purchasers as a shortened form of [Home Chef]'s mark." (Dckt. #18-8 at p. 5). Home Chef asserts that it will be unable to use its HC House Mark standing alone without running the risk that consumers will associate the mark with Grubhub. (Dckt. #56 at pp. 46-47). Based on the similarity between the HC House Mark and the JET House Logo, the USPTO examiner's finding, and the relative strength of GRUBHUB word mark (*infra*, at Section III(A)(5)), the Court finds that Home Chef's fears are warranted.

Second, the proposition that the prominent display of the parties' brand names on their marks reduces the likelihood of confusion even when the marks are otherwise similar extends only to cases where *forward* confusion is alleged. By contrast, where reverse confusion is alleged, the Seventh Circuit has recognized that the junior user's use of its well-known brand name with a mark that is similar to the senior user's mark can aggravate, not mitigate, the confusion that arises from the parties' use of similar marks. *See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992);[9] *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1164 (9th Cir. 2021) ("in a reverse confusion case the junior user's use of a house mark can also aggravate confusion by reinforcing the association between the [senior user's] mark and the junior user"); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992) ("[T]he prominence of Russ's housemark may serve to create reverse confusion that Russ, and not Amtra, is the source of Amtra's 'Wedding bears.' Russ's housemark therefore does not, as a matter of law, render its use of 'Wedding Bear' non-similar to Amtra's

---

[9] In *Sands*, a reverse confusion case, the plaintiff Sands, Taylor & Wood brought a trademark infringement action against The Quaker Oats Company alleging that Quaker's use of the words "Thirst Aid" in its advertising slogan "Gatorade is Thirst Aid" infringed on its registered trademark for THIRST-AID. *Sands*, 978 F.2d at 949, 957. Quaker argued that its use of the well-known brand name "Gatorade" with its "Thirst Aid" ads eliminated any similarity that might have otherwise existed. *Id.*, at 960. The Seventh Circuit rejected this argument and held that "it is precisely the strong association between Gatorade and 'Thirst Aid' created by Quaker's ads that is likely to create confusion in this case." *Id.*

trademark."); *Breuer Elec. Mfg. Co. v. Hoover Co.*, No. 97 C 7443, 1998 WL 427595, at *6 (N.D.Ill. July 23, 1998) (citing *Sands*); *TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F.Supp. 543, 550–51 (N.D.Ill. 1995) (citing *Sands*). Thus, because Home Chef alleges reverse confusion, Grubhub's use of its brand name with the JET House Logo does not neutralize – and may actually aggravate – any confusion that arises from the similarity between that mark and the HC House Mark.

Finally, it is not accurate to say that Grubhub *always* uses its brand name GRUBHUB with the JET House Logo because it has also combined the brand name Seamless with the JET House Logo to create the Seamless Lock-up Logo. (Dckt. #40 at ¶19).[10] The Seamless Lock-up Logo, which on its face  indicates that Seamless is affiliated with Grubhub, illustrates that Grubhub uses more than one brand name with the JET House Logo. Consumers who are aware of this fact could view the HC House Mark combined with the Home Chef word mark and mistakenly believe that Home Chef (like Seamless) is affiliated with Grubhub. The Seventh Circuit's decision in *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994), is instructive. In that case, the alleged infringer (Hersey) was known to have sold water meters made by another manufacturer under its own private label. *Id.*, at 1152. The Seventh Circuit recognized that Hersey's use of its trademark on a water meter that was almost identical to the water meter of Badger (the plaintiff) would not prevent purchasers from inferring that Hersey and Badger were involved in a similar private label deal. *Id.*

In sum: this factor weighs in favor of Home Chef.

---

[10] Home Chef has also argued that Grubhub, on occasion, uses the JET House Logo without the Grubhub brand name. (Dckt. #47 at p. 10). During oral argument, however, Grubhub explained that those materials were presented to overseas investors or are images taken from Grubhub's website. (Dckt. #56 at pp. 8–9).

### 2. The Similarity of the Products

As the Seventh Circuit has recognized, "[m]odern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's. . . [and] [a] 'closely related' product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Sands*, 978 F.2d at 958 (internal quotation marks and citations omitted); *Ty, Inc.*, 237 F.3d at 900 (quoting *Sands*). Accordingly, "[a] likelihood of confusion may exist even if the parties are not in direct competition . . . , or their products and services are not identical." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001) (citation omitted).

Grubhub argues that the parties' products and services are sufficiently dissimilar because "Home Chef offers at-home meal kits requiring home cooking through subscription services or through grocery store sales, while Grubhub offers restaurant ordering (delivery, takeout, and catering) services." (Dckt. #46 at p. 26). However, Grubhub's description of Home Chef's products and services is unduly myopic. As explained above in Section I(A)(1)(a), Home Chef offers over 500 products in addition to meal kits, including ready-to-eat products, heat-and-eat meals, and seasonal meals. Home Chef's products can be purchased in store or for same-day, home delivery from more than 2,000 Kroger grocery stores, including through Instacart and DoorDash (both competitors of Grubhub). Moreover, Grubhub offers meal delivery services from grocery stores, Grubhub has identified Kroger as one of its "current partners," and select Grubhub customers can even order Home Chef vouchers through Grubhub's app. Finally, Home Chef markets itself to consumers as an alternative to restaurant takeout/delivery provided by DoorDash and other restaurant delivery services and the public considers the parties' meal

delivery services to be competing services.  (Dckt. #18-3 at ¶33; Dckt. #18-5 at pp. 58–71, 74–102 (articles dated September 27, 2021, and October 4, 2021, which compare and contrast the food delivery services offered by Grubhub, Seamless, Home Chef, and twenty-five other companies)).[11]

Based on this evidence, the Court finds that the parties' respective products and services are "closely related" within the meaning of Seventh Circuit precedent.[12]  *Ty, Inc.*, 237 F.3d at 900; *Sands*, 978 F.2d at 958; *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988) (finding that plaintiff's service of promoting and sponsoring dog shows was sufficiently related to defendant's toy-dog products to cause confusion); *Brithric Enterprises, LLC v. Bay Equity LLC*, No. 20-CV-04696, 2021 WL 1208957, at *6 (N.D.Ill. Mar. 31, 2021) (even though the parties were not direct competitors, their products were related given the overlap in services where consumers could conceivably use both firms' services in a single transaction).  This factor weighs in favor of Home Chef.

---

[11] Grubhub also relies on two factually distinguishable cases.  (Dckt. #46 at p. 27 (citing *Barbeque Marx, Inc. v. 551 Ogden, Inc.*, *supra*, and *Bobak Sausage Co. v. A&J Seven Bridges, Inc.*, *supra*).  In *Barbeque Marx*, the Court declined to find that the district court's determination that two barbeque restaurants offered the same product (barbeque) was clearly erroneous, but it did note that the "differences in the restaurants' ambience and themes . . . certainly weaken[ed] this factor's strength in favor of [plaintiff]." *Barbeque Marx*, 235 F.3d at 1044–45.  In *Bobak*, the court – which found that this factor favored defendant – recognized that although both parties provided food, "the manner in which the food [wa]s provided and the type of food that is offered differ[ed] substantially" because one business sold sausage and deli products for pick up or delivery while the other business hosted banquets, wedding receptions, and conferences for up to 1,200 people and served "fancier" and "more expensive offerings" (such as chicken cordon blue, stuffed beef tenderloin, and chicken saltimbocca with sun-dried tomato au jus). *Bobak*, 805 F.Supp.2d at 516.

[12] The USPTO examiner also compared the goods and services offered by the parties – as described in the application and registrations at issue and as evidenced by various internet postings – and found them to be related.  (Dckt. #18-8 at pp. 5–6).

### 3. The Area and Manner of Concurrent Use

In considering the area and manner of concurrent use factor, courts "have to assess whether 'there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *Ty, Inc.*, 237 F.3d at 900, *quoting Forum Corp. of North America v. Forum*, 903 F.2d 434, 442 (7th Cir. 1990); *CAE, Inc.*, 267 F.3d at 681. Courts also consider "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorenson v. WD-40 Co.*, 792 F.3d 712, 730 (7th Cir. 2015). Where the parties make extensive use of the internet to market and advertise their products and services, that is "a factor that courts have consistently recognized as exacerbating the likelihood of confusion." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999); *RDK Corp. v. Larsen Bakery, Inc.*, No. 02-C-0675, 2006 WL 2168797, at *19 (E.D.Wis. July 31, 2006).

Here, the record shows that: (1) the parties' meal delivery services are both advertised and sold nationwide via the internet: (2) the parties offer their services and/or products in grocery stores; (3) the parties advertise their products and services through the same online marketing channels to compete for the same customers (namely, the 49% of dinners that are up for grabs every day with customers making decisions about where to get their meals that same day);[13] and (4) Grubhub sells Home Chef vouchers on its app. In light of this evidence, the Court finds that there is a relationship in the use, promotion, and sales between the goods and services of the parties. This factor weighs in favor of Home Chef.

---

[13] (*See* Dckt. #18-3 at ¶30; Dckt. #18-8 at p. 38).

### 4.     The Degree of Care Likely to be Exercised by Consumers

"The degree of care likely to be exercised by consumers is determined by considering several factors, including the expense of the product and the sophistication of the purchasers." *Bobak Sausage*, 805 F.Supp.2d at 517 (citing cases).  Furthermore, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 638 (5th Cir. 1985) (stating that the simplicity and negligible cost of Fuji's goods and its extensive advertising increased the likelihood of confusion about the source of the goods)); *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 426 (7th Cir. 2019) (same).  In assessing this factor, the Court must consider "both parties' potential customers," *CAE, Inc.*, 267 F.3d at 682, and it "stand[s] in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 769 (8th Cir. 2010) (internal quotation marks omitted). "When consumers use a lesser degree of care, this supports a finding that there is a likelihood of confusion." *Sorenson*, 792 F.3d at 730.

Home Chef, whose products can be purchased for as little as $6.99 per serving, (Dckt. #18-1 at ¶15), asserts that the products and services offered by both parties are inexpensive and widely available for purchase through the internet, subscription services,[14] and grocery stores nationwide.  (Dckt. #18 at pp. 15–16; Dckt. #47 at pp. 14–15).  Home Chef has also provided evidence that 49% of diners make decisions about where to get their meals for dinner earlier that

---

[14] Grubhub has a subscription service known as Grubhub+ which enables its customers to receive free delivery and other perks in exchange for a $9.99 monthly membership.  (Dckt. #18-9 at pp. 19–22, 34–35).  In contrast to Home Chef's subscription service, however, the price of Grubhub's subscription service does not include the provision of any meals.

same day. (Dckt. #18-3 at ¶30; Dckt. #18-8 at p. 38). The relatively inexpensive meal prices combined with spur-of-the-moment decision-making suggests that many meal purchases are impulse purchases. *See Sorenson*, 792 F.3d at 730 ("Both Sorensen's and WD-40's products are quite inexpensive (under $12), and could even be characterized as impulse purchases."); *Frisch's Restaurant, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) ("The 'fast food' products promoted by Elby's are not likely to be the object of intensive consumer research, but rather subject to 'impulse buying.'"); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) ("Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."); *Pilot Corp. of Am. v. Fisher-Price, Inc.*, 501 F.supp.2d 292, 309 (D.Conn. 2007) (products in the range of $7.99 to $14.99 are "relatively low-priced").

Grubhub does not deny that its services are relatively inexpensive and are available nationwide through the above outlets. Nor does Grubhub claim that its own customers exercise a high degree of care and discretion in their purchases. Instead, Grubhub asserts that this factor weighs in its favor because Home Chef's customers are likely to exercise a reasonable degree of care when selecting Home Chef's at-home meal kits because meal kit subscriptions – which start at $50 per week – are more expensive. (Dckt. #46 at p. 28 (citing *Duluth News-Trib. v. Mesabi Pub. Co.*, 84 F.3d 1093 (8th Cir. 1996)). While the Court agrees that a consumer's degree of care does not depend solely on price, *Nike, Inc.*, 6 F.3d at 1230, and that a subscription-based manner of purchase typically implies a higher degree of care by the subscribers, the facts in *Duluth News-Trib.* are distinguishable from the record here.

In *Duluth News-Trib.*, the court concluded the evidence was insufficient to create a genuine issue of material fact regarding the likelihood that an appreciable number of consumers

would be confused where approximately 92% of defendants' newspapers were sold through home subscriptions and only 6% of their papers were sold in a way where the buyers could potentially be confused. *Duluth News-Trib.*, 84 F.3d at 1099. In this case, there is no clear evidence regarding what percentage of Home Chef's current revenues is attributable to subscription meal-kit sales. *See Metropcs Wireless, Inc. v. Virgin Mobile, L.P.*, No. CIV.A. 3:08-CV-1658, 2009 WL 3075205, at *11 n.13 (N.D.Tex. Sept. 25, 2009) (distinguishing *Duluth News-Trib.* on the ground that there was no clear evidence of the percentage of potential consumers who would be confused about the product in question).

Home Chef, which began as a subscription-based meal kit service, argues that the dramatic increase in its revenue and in the number of meals it sold per month between 2018 and 2021 is due to its sales of a diversified array of products in Kroger stores nationwide. (Dckt. #56 at pp. 30, 46). The record provides support for this conclusion. In particular, Home Chef had $250 million in revenue in 2017, prior to its 2018 merger with Kroger, the expansion of its product line beyond meal kits to include heat-and-eat and ready-to-eat products, and the introduction of Home Chef products into more than 2,200 Kroger stores nationwide. (Dckt. #18-1 at ¶¶10–12, 16). By October 2021, Home Chef's annual sales had reached $1 billion. (*Id.*, at ¶13). Given that Home Chef's revenue quadrupled after it expanded its product line beyond subscription meal kits and began selling its products in Kroger stores nationwide, it is reasonable to infer that the majority of Home Chef's customers are not subscribers to its meal kit service but instead are purchasers of Home Chef's relatively inexpensive products on an a la carte basis. Grubhub's customers likewise utilize Grubhub's relatively inexpensive services[15] on an ad hoc, a la carte basis.

---

[15] Grubhub's delivery fees per order are between $1.00 and $10.00 but most typically range between $2.50 to $7.50. (Dckt. #18-9 at p.33).

For these reasons, this factor weighs in favor of Home Chef.

**5.       The Strength of Home Chef's Mark**

The "strength" of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products and services sold as emanating from a particular source. *CAE, Inc.*, 267 F.3d at 684. "The stronger a mark, the more one is likely to associate similar marks and products with it." *Am. Soc'y of Plumbing Engineers v. TMB, Pub., Inc.*, 109 Fed.Appx. 781, 789 (7th Cir. 2004); *AutoZone*, 543 F.3d at 933. Accordingly, a strong mark receives broader protection than a weak mark. *TMB, Pub.*, 109 Fed.Appx. at 789; *CAE, Inc.*, 267 F.3d at 684. In assessing the strength of a mark, courts consider: (1) its type (namely, whether it is generic, descriptive, suggestive, arbitrary, or fanciful in ascending order of distinctiveness/strength); (2) whether it has been subject to wide and extensive advertising or use by the holder; or (3) a combination of both. *Id.* In addition, the commercial strength of the mark of Grubhub (the junior user) must be considered since reverse confusion is alleged here. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000). "Also of value in this analysis is the extent of third-party use and registration of the term or similar terms," as "the more use and promotion of similar marks by third parties, the weaker the mark and the less protection afforded." *TMB, Pub.*, 109 Fed.Appx. at 789 (citing *CAE, Inc.*, 267 F.3d at 685); *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986)).

Grubhub does not dispute that the USPTO has issued registrations for the HC House Mark (both with and without the HOME CHEF word mark), and it does not attempt to characterize the "type" of marks that Home Chef possesses. Accordingly, the Court will presume that Home Chef's marks are "at least suggestive and not 'merely descriptive.'" *See Uncommon*, 926 F.3d at 420.

32

Moreover, Home Chef asserts – and Grubhub does not dispute (Dckt. #46 at p. 26) – that both Home Chef and Grubhub have commercially strong marks given the "millions of dollars" that each company has spent in promoting their products and services.  (Dckt. #46 at p. 24).  Indeed, Grubhub asserts that Home Chef's commercial success eliminates the possibility that any reverse confusion has occurred.  (Dckt. #46 at p. 26).  In particular, Grubhub's counsel stated the following at the oral argument:

> And I will add that [Home Chef's] theory of reverse confusion is ludicrous, your Honor, and I would not use that word lightly.  Home Chef argues on the one hand that they're a growing, dominant, billion dollar-plus company, yet they're arguing that Grubhub, which is slightly larger, will overwhelm them with their marketing effort.  You simply cannot have it both ways.  You can't say that you're extremely well known and that your mark is strong and widely recognized and then argue reverse confusion, it just doesn't work.

(Dckt. #56 at p. 28).

The Court disagrees.  To begin, Grubhub's sales revenues ($1.8 billion in 2020) are not "slightly larger" than Home Chef's ($1 billion in 2021); rather, they are at least 80% higher.[16]  Moreover, Grubhub asserts without dispute that it has one of the "most well-known brands in the United States" – a claim that Home Chef does not make – and Grubhub has more than 32 million active diners in its portfolio.[17]  (Dckt. #40 at ¶7; Dckt. #46-4 at ¶4).  Grubhub has cited no authority in support of its argument that the commercial size of a registered mark holder, standing alone, immunizes it from experiencing reverse confusion and there is no logical reason

---

[16] Although the magnitude of Grubhub's sales revenues for 2021 is not readily available, it is reasonable to presume that Grubhub's sales revenues in 2021 exceeded its revenues in 2020 given the $500 million rise in Grubhub's revenues between 2019 and 2020 and the persistence of the Covid-19 pandemic.

[17] By comparison, Home Chef has less than 800,000 followers on Facebook, Instagram, Pinterest, and Twitter combined.  (Dckt. #18-3 at ¶¶7–9, 11).

why this would be the rule. After all, "there's always a bigger fish"[18] and it is the disparity between the commercial size and marketing power of the junior user on the one hand and the senior user on the other, that is the relevant consideration for reverse confusion. *Dorpan*, 728 F.3d at 65 (reverse confusion occurs when a senior user is "overwhelmed by a more commercially powerful junior user"); *A & H Sportswear, Inc.*, 237 F.3d at 231 (with reverse confusion, courts consider "(1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark").

Grubhub also asserts that Home Chef's HC House Mark "is not entitled to a broad scope of protection" because it "combines widely used elements for services in the dining field, which . . . are also used in many other third-party marks." (Dckt. #46 at p. 25). However, Grubhub – which engaged a leading trademark search vendor to perform trademark searches regarding logos that consist of house and/or cutlery designs used with meal kits, meal preparation, dining, and/or restaurant services (Dckt. #46-2 at pp. 2–3) – was unable to find any other images showing a house figure with a fork on the left side and a knife on the right side as depicted in the HC House Mark and the Jet House Logo. (Dckt. #56 at p. 16). Moreover, the two marks that Grubhub suggests are similar to the HC House Mark are, in fact, not similar because they contain additional elements that are configured in significantly different ways. In particular, both marks contain a spoon (in addition to a fork and a knife), one mark uses a spoon, knife, and fork as elements of a house image itself and not inside the house image, and the other mark does not include a house image at all:

---

[18] This phrase, famously uttered by Jedi Master Qui-Gon Jinn in *Star Wars: Episode I – The Phantom Menace*, calls to mind an old proverb: "no matter how large or intimidating a person or thing is, there is likely to be an even larger or more intimidating person or thing somewhere."

 

(Dckt. #46 at p. 20). Finally, the sole case Grubhub cites in support of its argument on this point is factually distinguishable because the asserted trademarked phrase was in common use in the relevant industry. (*Id.* (citing *Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*, 707 F.3d 869 (7th Cir. 2013)).[19]

This factor favors Home Chef.

### 6. Actual Confusion

As Grubhub acknowledges, Home Chef is not required to present proof of actual confusion to establish a preliminary injunction or to otherwise prove that a likelihood of confusion exists. *CAE, Inc.*, 267 F.3d at 685-86; *Int'l Kennel Club*, 846 F.2d at 1090; (Dckt. #53 at pp. 23–24). Nonetheless, "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion," and evidence of actual confusion is entitled to "substantial weight." *Int'l Kennel Club*, 846 F.2d at 1089–90 (internal quotation marks omitted); *CAE, Inc.*, 267 F.3d at 685; *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 69 (1st Cir. 2013) (internal quotation marks omitted) ("[P]ast confusion is frequently a strong indicator of future confusion."). Indeed, the Seventh Circuit has recognized that even "[o]ne instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion." *CAE, Inc.*, 267 F.3d at 686; *Wesley-Jessen*, 698 F.2d at 867; *Varian Assocs. v. IMAC Corp.*, No.

---

[19] In *Eastland*, the plaintiff claimed a trademark in the phrase "50/50" and brought suit against defendants, alleging that they infringed on its rights by using "50/50" as the title of a movie. *Eastland*, 707 F.3d at 870. The Seventh Circuit recognized that "[t]he phrase 50/50 or a sound-alike variant (50-50, fifty-fifty, fifty/fifty) has been in use as a title of intellectual property" and that at least eight other films, three TV shows, and three songs incorporated the phrase in their titles. *Id.*, at 871. In view of this, the court opined that "[i]f there is any prospect of intellectual property in [the] phrase 50/50," plaintiff's "rights are correspondingly weak and narrow." *Id.*

66 C 1446, 1968 WL 8436, at *5 (N.D.Ill. Nov. 8, 1968) (finding that plaintiff's proof of a single incident of actual confusion was "additional persuasive evidence of the likelihood of confusion."). Furthermore, "while very little proof of actual confusion [is] necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Int'l Kennel Club*, 846 F.2d at 1089 (internal quotation marks omitted); *Dorpan*, 728 F.3d at 69.

### a. Home Chef's Evidence of Actual Confusion

Home Chef offers evidence of two instances of actual confusion. First, on September 8, 2021, a Home Chef customer sent Home Chef's Facebook account a message which read, "Did you and Grub Hub merge or come to some sort of mutual deal, because I had to take a double take today when my Grub hub app updated." (Dckt. #18-3 at ¶41; Dckt. #18-5 at p. 146). The customer included the following screen shot with the message:



(Dckt. #18-3 at ¶ 41; Dckt. #18-5 at p. 147).[20] Evidence of actual confusion includes such situations where consumers raise questions about whether a senior user and a junior user are affiliated after viewing their respective marks. *See, e.g., CAE, Inc*., 267 F.3d at 686 (noting that the "one instance of actual confusion in the record" occurred when one of plaintiff's suppliers asked whether "there [wa]s a connection between" defendant and plaintiff's subsidiary); *Unity*

---

[20] Home Chef knows the identity of this customer but redacted it to preserve the customer's privacy. (Dckt. #56 at p. 69).

*Health Plans Ins. Co. v. Iowa Health Sys.*, 995 F.Supp.2d 874, 894 (W.D.Wis. 2014) (finding that a call during which a consumer asked "whether Unity Health and UnityPoint are affiliated in some way" constituted "somewhat more persuasive" evidence of actual confusion).

Second, according to Home Chef's Marketing Director (whose duties include managing Home Chef's social media accounts), a Twitter user posted the following "tweet" on August 25, 2021:



(Dckt. #18-3 at ¶ 40). "The most relevant evidence of actual confusion is the testimony of a reasonably prudent purchaser who was in fact confused by defendant's trademark,"[21] and courts can rely on such consumer inquiries to a moving party when assessing the likelihood of confusion. *See, e.g., Unity Health*, 995 F.Supp.2d at 893, *quoting Int'l Kennel Club*, 846 F.2d at 1090 ("The Seventh Circuit has upheld a finding of consumer confusion based on 'letters, phone

---

[21] *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 104 F.Supp.2d 427, 464 (D.N.J. 2000), *aff'd*, 269 F.3d 270 (3d Cir. 2001) (internal quotation marks omitted).

calls, and inquiries received by the plaintiff.'"); *Boathouse Grp., Inc. v. TigerLogic Corp.*, 777 F.Supp.2d 243, 253 (D.Mass. 2011) (finding that party's "evidence of several instances of actual confusion in posts on Twitter and other websites" provided "persuasive evidence of future confusion").

According to Grubhub, the above evidence should be disregarded or given little weight for three reasons.

First, Grubhub asserts the above evidence does not reflect actual confusion because the consumer who communicated by Twitter recognized that Grubhub and Home Chef are separate customers and "the absence of actual confusion is highly persuasive evidence that confusion is not likely." (Dckt. #46 at p. 24, *quoting Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 884 (N.D.Ill. 1992)). However, as explained above, the concept of actual confusion is not limited to circumstances where consumers mistakenly believe that the senior and junior users are the same company, but instead extends to situations where customers question whether there is an affiliation or connection between the two users.

Furthermore, even if Home Chef had offered no evidence of actual confusion, the high degree of significance that the *Ohio Art* court accorded to the lack of such evidence is inconsistent with later Seventh Circuit precedent, which holds that "the most that the absence of evidence of actual confusion can be said to indicate is that the record does not contain any evidence of actual confusion known to the parties." *CAE, Inc.*, 267 F.3d at 686 (finding that even where there was a twenty-five-year history without any reported incidents of actual confusion, the district court "properly treated this factor as weighing only slightly in favor of a conclusion that no likelihood of confusion exists"). This is so because "instance of actual confusion may be difficult to discover," particularly where – as here – the products and services

involved are relatively inexpensive. *Id.*; *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 275 F.Supp.2d 543, 752 (D.N.J. 2003) ("The law recognizes that random instances of confusion often go unreported or unrecorded."); *see also Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 383 (7th Cir. 1976) ("The value of evidence of actual confusion is greater when the products involved are low value items because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion.").

Second, Grubhub asserts that Home Chef's evidence of actual confusion should be excluded because it is hearsay. (Dckt. #46 at p. 24). However, Home Chef's evidence is not hearsay because it is not offered for the truth of the matter asserted but rather to show "that consumers are indeed confused." *Sarkis' Café, Inc. v. Sarks in the Park, LLC*, No. 12 C 9686, 2016 WL 723135 at *8 n.15 (N.D.Ill. Feb. 24, 2016); *Vacation Rental Partners, LLC v. VacayStay Connect, LLC*, No. 15 CV 10656, 2017 WL 1150806, at *10 (N.D.Ill. Mar. 28, 2017) (same). In any event, courts may consider hearsay on preliminary injunction proceedings. *Mechling*, 2021 WL 3910752, at *1.

Third, Grubhub asserts that *de minimis* evidence of actual confusion is insufficient to support a finding of actual confusion. (Dckt. #46 at p. 24 (citing cases)). However, all of the cases that Grubhub cites in support of this proposition are distinguishable because they involved summary judgment motions and *not* preliminary injunction proceedings. The procedural posture of a case makes a difference in terms of how evidence of actual confusion is weighed. *See, e.g., Weber-Stephen Prod. LLC v. Sears Holding Corp.*, 145 F.Supp.3d 793, 802 n.6 (N.D.Ill. 2015) (finding that the Seventh Circuit's holding in *CAE* that one instance of actual confusion is sufficient to weigh in favor of finding a likelihood of confusion "is not the same as the Seventh

Circuit holding that *one* instance of actual confusion alone would be sufficient to deny summary judgment") (emphasis in original).

<b>b.      Grubhub's Survey Evidence</b>

In addition to the type of anecdotal evidence cited by Home Chef, consumer survey evidence can be – but need not be – introduced during preliminary injunction proceedings to prove (or disprove) the existence of actual confusion regarding the parties' respective marks. *See Meridian Mut. Ins.*, 128 F.3d at 1119 (rejecting defendant's argument that plaintiff's failure to produce a consumer survey showing a likelihood of confusion negated plaintiff's anecdotal evidence of actual confusion at the preliminary injunction stage). In this case, Grubhub retained survey researcher Hal Poret to conduct surveys to assess whether Grubhub's use of the Grubhub Lock-up Logo causes consumer confusion between Grubhub and Home Chef under reverse and forward theories of confusion. (*See* Dckt. #46-3 – Decl. of Hal Poret).

Poret used the standard "Eveready" survey format, "in which respondents are shown the trademarks at issue and questioned to determine if they make a mistaken mental connection to the other party's mark," for both of his studies. (Dckt. #46-3 at ¶7); *Nail All., LLC v. Poly-Gel L.L.C.*, No. 17-CV-01026-FJG, 2019 WL 5295501, at *4 (W.D.Mo. June 27, 2019) (noting that the Eveready format is standard and widely accepted). For the reverse confusionstudy, Poret selected 300 respondents from a universe of "U.S. consumers age[d] 18 and older who have used an online or in-app service for home delivery of meal prep kits or ready-to-eat meals in the past six months, or are likely to consider using such a service in the next six months." (Dckt. #46-3 at p. 41). Poret exposed the respondents to Home Chef's HC House Mark and then asked the respondents a series of questions to determine whether they mistakenly associated Home Chef's mark and/or its products and services with Grubhub. (Dckt. #46-3 at ¶8). None of the 300

respondents answered that "Home Chef's application/website or service is offered by, or affiliated with, or sponsored or approved by, Grubhub." (Dckt. #46-3 at ¶11).

For the forward confusion study, Poret selected 300 respondents from a universe of "U.S. consumers, age[d] 15 and older who have used an online service for food delivery from local restaurants or stores in the past six months, or [are] likely to consider using such a service in the next six months." (Dckt. #46-3 at p. 44). Poret exposed these respondents to Grubhub's Lock-up Logo and then asked the respondents a series of questions to determine whether they mistakenly associated Grubhub's mark or services with Home Chef. (Dckt. #46-3 at ¶9). None of the 300 respondents answered that the "Grubhub application/website or service is offered by, or affiliated with, or sponsored or approved by, Home Chef (or Kroger)." (Dckt. #46-3 at ¶13).

In sum, Poret opines that his survey results "powerfully demonstrate" that Grubhub's use of the Grubhub Lock-up Logo does not create a likelihood of confusion with Home Chef or the HC House Mark under either the reverse or forward confusion theory. (Dckt. #46-3 at ¶¶12, 14). Grubhub goes even further and asserts that Poret "*definitively establishes that no confusion is occurring between the marks.*" (Dckt. #46 at p. 23 (emphasis in original)). Home Chef, on the other hand, argues that Poret's surveys should be deemed inadmissible or, at a minimum, given little weight for a number of reasons. (*See* Dckt. #47 at pp. 18–20). The Court finds that Poret's surveys (though admissible for purposes of these proceedings) are entitled to little weight for the following five reasons.

First, Poret did not use the proper universe of consumers when selecting respondents for his reverse confusion survey. Respondents for a reverse confusion study should be drawn from a universe consisting of the customer base of the senior user (here, Home Chef). *See, e.g., Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 120-21 (3d Cir. 2004); *Sterling*

*Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). Here, although Poret evidently intended to draw from Home Chef's customer base, he selected his respondents exclusively from consumers who purchased (or would consider purchasing) meal prep kits or ready-to-eat meals either "online" or through an "in-app service." (Dckt. #46-3 at p. 41). This universe of consumers *excludes* actual and prospective Home Chef customers who make *in-store* purchases of Home Chef products at the Kroger stores nationwide as well as Home Chef customers who purchase heat-and-eat products (as opposed to meal kits and ready-to-eat meals). "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 6 McCarthy on Trademarks and Unfair Competition §32.159 (5th ed. 2022).

Second, Poret's surveys failed to accurately reflect the actual marketplace conditions. *See, e.g., Maui Jim,* Inc*. v. SmartBuy Guru Enterprises*, No. 1:16 CV 9788, 2019 WL 5577165, at *4 (N.D.Ill. Oct. 29, 2019) ("[S]urveys should replicate the marketplace conditions as well as possible."). In particular, the surveys did not account for how consumers react to: (1) Home Chef's use of the HC House Mark *without* the Home Chef trade name, including in advertisements;[22] (2) Home Chef's sales of its products in Kroger grocery stores; and (3) Grubhub's use of the Seamless Lock-up Logo. The failure to mirror marketplace conditions is significant because "'the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.'" *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, No. 07 C 4718, 2010 WL 1687883, at *5 (N.D.Ill. Apr. 26, 2010), *quoting* 5 McCarthy on Trademarks §32:163 at 32-237 (4th ed. 1999); *BDO Remit (USA), Inc. v. Stichting BDO*, No. CV1104054MMMCWX, 2012 WL 12895658, at

---

[22] At oral argument, Grubhub's counsel confirmed that Poret used prompts which had the HC House Mark right above or right alongside the Home Chef word mark. (Dckt #56 at pp. 35–36).

*10 (C.D.Cal. Sept. 19, 2012), *quoting THOIP v. Walt Disney Co.*, 788 F.Supp.2d 168, 180

(S.D.N.Y. 2011) ("[T]he court is particularly concerned about Ostberg's failure 'to replicate

actual marketplace condition,' which would seem to be a critical factor in assessing likelihood of

confusion.").

Third, the methodology Poret used to question the survey respondents amounted to what

some courts have described as a "memory test."  *See, e.g., Starter Corp. v. Converse, Inc.*, 170

F.3d 286, 297 (2d Cir. 1999) (district court properly excluded a study that "was little more than a

memory test, testing the ability of the participants to remember the names of the shoes they had

just been shown").  In particular, Poret showed the respondents images from Home Chef's

website and mobile app (for the reverse confusion survey) and images from Grubhub's website

and mobile app (for the forward confusion survey) and then asked the respondents what

company they thought offered the app/service they were shown and whether they thought the

app/service is affiliated with, sponsored by, or approved by any other company.  (Dckt. #46-3 at

pp. 17–18, 23–24, 32–33, 37–38).

Surveys that do nothing more than test the memory of survey respondents are given little,

if any, weight in the likelihood of confusion analysis.  *See, e.g., Starter Corp.*, 170 F.3d at 297

("memory test" study "gave no indication of whether there was a likelihood of confusion in the

marketplace"); *Instant Media, Inc. v. Microsoft Corp.*, No. C 07-02639 SBA, 2007 WL 2318948,

at *14–15 (N.D.Cal. Aug. 13, 2007) ("Microsoft's survey is little more than a 'memory test,'

measuring how many respondents who had just read the source indicators 'Instant Media' and

'I'M' on a website could accurately recall them.  Such a survey is useless in the Court's analysis

of likelihood of confusion."); *Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*, 988

F.Supp. 322, 334–35 (S.D.N.Y. 1987) ("Surveys which do nothing more than demonstrate the

respondents' ability to read are not probative on the issue of likelihood of consumer confusion."); 6 McCarthy on Trademarks and Unfair Competition §32.171 (5th ed. 2022).

Fourth, Poret failed to use control groups with his surveys of reverse and forward confusion. (Dckt. #56 at p. 31). A leading treatise and some courts have held that a properly constructed survey designed to estimate likelihood of confusion *must* include a proper control group because "[w]ithout a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *Saxon Glass Tech., Inc. v. Apple Inc.*, 393 F.Supp.3d 270, 287 (W.D.N.Y. 2019), *aff'd*, 824 Fed.Appx. 75 (2d Cir. 2020) (internal quotation marks omitted; citing cases); 6 McCarthy on Trademarks and Unfair Competition §32.187 (5th ed. 2022). Other courts have found that the lack of a control group goes to the weight, and not the admissibility, of a survey. *See, e.g., Bobak Sausage Co.*, 2010 WL 1687883, at *20. The Court's Westlaw search involving cases in which Poret has served as an expert witness confirms that he typically (but not always) uses a control group with his consumer surveys and that he has even criticized at least three other experts for *their* failure to use a proper/reliable control group or any control group at all. *See Superior Consulting Services, Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL 4435818, at *12 (11th Cir. Sept. 28, 2021) (citing to Poret's criticisms); *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing and Distilling Co., LLC*, 1:21-CV-161-RP, 2021 WL 5568159, at *9 (W.D.Tex. Nov. 28, 2021) (same); *Zetor North America, Inc. v. Rozeboom*, No. 3:15-cv-03035, 2018 WL 3865411, at *17-18 (W.D.Ark. Aug. 14, 2018) (same).

Finally, even setting the above methodological issues aside, there is yet another reason why the results of Poret's surveys are entitled to little weight. Poret interviewed the survey respondents between November 10 and November 15, 2021, (Dckt. #46-3 at p. 53), which was

44

less than three months after Grubhub issued the August 24, 2021 press releases and changed its app to feature the Grubhub Lock-up Logo.  Where – as here – the parties' respective "logos ha[ve] only coexisted for several months," courts have treated the lack of actual confusion as "less salient" or even "irrelevant" when determining whether there is a likelihood of confusion. *See Boathouse Grp.*, 777 F.Supp.2d at 253; *TriMark, USA, Inc. v. Performance Food Grp., LLC*, 667 F.Supp.2d 155, 167 (D.Mass. 2009); *see also Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3D 112, 120-21 (1st Cir. 2006) (noting that "we have attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the markets on a long period of time" and finding that two years of product coexistence is not long enough to expect actual confusion).

In sum:  for the multiple reasons detailed above, the Court gives little weight to Grubhub's survey evidence and finds that it is insufficient to refute Home Chef's evidence of actual confusion.  *See Int'l Kennel Club*, 846 F.2d at 1089; *Dorpan*, 728 F.3d at 69 ("[O]nce the party alleging infringement has put forward evidence of actual confusion, the alleged infringer is left fighting an uphill battle in arguing that no reasonable fact finder could find a substantial likelihood of confusion.") (internal quotation marks omitted).  Consequently, this factor weighs strongly in favor of Home Chef.

### 7.    Evidence Regarding Grubhub's Intent

In a forward confusion case, the junior user's intent is relevant to the issue of likelihood of confusion if the junior user intended to palm off its products as those of the senior user. *Sands*, 978 F.2d at 961.  In a reverse confusion case, where the junior user typically has no desire to capitalize on the senior user's good will, courts consider whether "the more well-known junior user ignored the senior user's rights" or otherwise "culpably disregarded the risk of reverse

45

confusion." *Imperial Toy Corp. v. Ty, Inc.*, No. 97 C 8895, 1998 WL 601875, at *6 (N.D.Ill.

Sept. 9, 1998) (citing cases); *JL Beverage Co., LLC v. Beam, Inc.*, 318 F.Supp.3d 1188, 1210

(D.Nev. 2018), *aff'd*, 815 Fed.Appx. 110 (9th Cir. 2020) (internal quotation marks omitted).

While proof of intent is an important factor in the likelihood of confusion analysis, such evidence

is not necessary to prove trademark infringement where a likelihood of confusion otherwise

exists. *Sands*, 978 F.2d at 961; *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C

02242, 2013 WL 6839815, at *8 (N.D.Ill. Dec. 27, 2013).

Grubhub asserts that it adopted the Grubhub Lock-up Logo in good faith to align its

branding with the branding of its new parent company (JET), which began using the JET House

Logo overseas in 2014, and that it had no intent to pass off its services as originating from Home

Chef. (Dckt. #46 at p. 23). Home Chef does not dispute that JET initially adopted the JET

House Logo in good faith or that Grubhub had no intent to capitalize on Home Chef's good will.

Instead, Home Chef asserts that Grubhub ignored its rights by using the JET House Logo

*after* the USPTO rejected JET's attempt to register the mark.[23] The Court agrees that this

evidence supports Home Chef's theory of reverse confusion. *See, e.g., Keystone Consol. Indus.,*

*Inc. v. Mid-States Distrib. Co.*, 235 F.Supp.2d 901, 913 (C.D.Ill. 2002) (the intent factor weighed

in favor of finding a likelihood of confusion where the junior user continued to use a mark that

was rejected by the USPTO as being likely to cause consumer confusion); *Varian Assocs.*, 1968

WL 8436, at *5–6 (same); *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. CV 96-

8938 DDP (ANX), 1997 WL 363970, at *5 (C.D.Cal. Feb. 14, 1997) (finding that defendants

were "not innocent users" where they used trademark with knowledge that the USPTO had found

---

[23] As the Court explained above in Section III(A)(1), the fact that Grubhub used the JET House Logo with the GRUBHUB trade name to create the Grubhub Lock-up Logo did *not* dispel the likelihood of reverse confusion that is created by Grubhub's use of the JET House Logo.

that their mark was likely to be confused with plaintiff's mark).  As the Seventh Circuit has

recognized, Grubhub had "a duty to select a trade dress that avoids a 'likelihood of confusion'"

with Home Chef's protectible trade dress.  *Badger Meter*, 13 F.3d at 1155; *Ty, Inc.*, 237 F.3d at

903 (same); *see also Bridgestone Americas Tire Operations, LLC v. Federal Corp.*, 673 F.3d

1330, 1333 (Fed. Cir. 2012) ("This court resolves doubts about the likelihood of confusion

against the newcomer because the newcomer has the opportunity and obligation to avoid

confusion with existing marks.") (internal quotation marks omitted).

In sum:  this factor, which weighs in favor of Grubhub on forward confusion and in favor

of Home Chef on reverse confusion, is neutral.

### 8. Consideration of the factors as a whole

To recap, all seven factors (the similarity between the marks in appearance and

suggestion; the similarity of the products; the area and manner of concurrent use; the degree of

care likely to be exercised by consumers; the strength of Home Chef's mark; the evidence of

actual confusion; and Grubhub's intent) weigh in favor of Home Chef with respect to its reverse

confusion theory.[24]  As such, Home Chef has made a sufficiently strong showing to demonstrate

---

[24] The picture is mixed with respect to Home Chef's forward confusion theory.  Although a number of
factors continue to weigh in favor of Home Chef when forward confusion is analyzed, two of the more
important factors do not.  In particular, the factor concerning Grubhub's intent (namely, did Grubhub
intend to pass off its services as those of Home Chef's) weighs strongly in favor of Grubhub.  The factor
involving the similarity between the marks is neutral under a forward confusion theory given Grubhub's
consistent use of the Grubhub Lock-up Logo (which features the JET House Logo *and* the GRUBHUB
brand name).  Indeed, this factor would favor Grubhub but for the evidence that Home Chef does not
always use its brand name with the HC House Mark and the fact that Grubhub continues its use of the
Seamless Lock-up Logo (which pairs the JET House Logo and the Seamless brand name).  Given its
finding regarding the strength of Home Chef's reverse confusion theory, the Court does not reach the
question of whether Home Chef has a sufficiently strong showing under its forward confusion theory to
establish a likelihood of confusion because Home Chef need not make the required showing under both
theories to establish its entitlement to injunctive relief.  *See, e.g., Uber Promotions*, 162 F.Supp.2d at
1265, 1282 (preliminary injunction warranted under reverse confusion theory even though only "scant
evidence" supported plaintiff's forward confusion theory).

that it is likely to succeed on the merits of its trademark infringement claim under the Lanham Act.

### B.    Home Chef Has Demonstrated Sufficient Risk of Irreparable Harm

Home Chef asserts that it will suffer irreparable harm if it is denied injunctive relief.  In particular, Home Chef asserts that it will experience a loss of good will and potential new customers due to the confusion created by Grubhub's use of the JET House Logo and the possibility that consumers will associate Home Chef with Grubhub.  (Dckt. #46 at p. 14).  According to Home Chef, being associated with Grubhub will damage Home Chef on account of Grubhub's "unsavory and negative reviews," bad press, and the class action lawsuits which allege that Grubhub engages in serious misconduct (*e.g.*, false advertising, deceptive and unfair business practices, and charging excessive fees) that harms the general public and the very restaurants with which Grubhub claims to partner.  (Dckt. #56 at pp. 46–49; Dckt. #46 at p. 14; Dckt. #18-3 at ¶¶gg-ii; Dckt. #18-10 at pp. 8–72).  Home Chef further asserts that it will have to change its co-branding and co-sponsorship strategy if it does not obtain injunctive relief in order to mitigate the damage caused by being associated with Grubhub.[25]  (Dckt. #56 at pp. 47–49).

The parties agree that the Trademark Modernization Act of 2020, 15 U.S.C. §1116(a), provides that Home Chef, as a party seeking a preliminary injunction, is entitled to a rebuttable presumption of irreparable harm upon this Court's finding that it has a likelihood of success on its trademark infringement claim.  (Dckt. #56 at pp. 56, 60).  Moreover, it is well-settled that damage to a trademark holder's good will and harm to its business reputation by being mistakenly associated with a junior user constitutes irreparable harm even if the trademark owner

---

[25] Potential limitations on Home Chef's ability to co-brand with other businesses and individuals is significant because "[t]he Lanham Act aims to protect 'the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets.'"  *CAE, Inc.*, 267 F.3d at 681, *quoting Sands*, 978 F.2d at 958.

offers no evidence that it has lost sales or market share. *See, e.g., Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001); *Wesley-Jessen*, 698 F.2d at 867; *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.3d 903, 908-09 (7th Cir. 1986); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025-26 (7th Cir. 1979); *Keystone*, 235 F.Supp.2d at 914-15; *Uber Promotions*, 162 F.Supp.3d at 1276-77 (finding irreparable harm in a reverse confusion case after noting that a senior user's reputation and good will could be damaged by the "negative press attention" that the junior user was receiving); *TV Land,* 908 F.Supp. at 554.

Grubhub asserts that Home Chef's delay of "more than ***three months***" in seeking injunctive relief weighs against a finding of irreparable harm.  (Dckt. #46 at p. 29 (emphasis in original)).  While it is true that "[a] lengthy, unexplained delay in seeking relief calls into question how urgent the need for [preliminary] equitable relief really is,"[26] Home Chef's delay in filing its motion for a preliminary injunction was neither lengthy nor unexplained.  In particular, Home Chef learned of Grubhub's rollout of the Grubhub Lock-up Logo on August 25, 2021, and filed its motion for a preliminary injunction on November 3, 2021 – exactly ten weeks (and not more than three months) later.  No case cited by Grubhub (or located by the Court, for that matter) has held that a delay of ten weeks between learning of infringement and filing for injunctive relief is sufficient to rebut the presumption of irreparable harm arising from a likelihood of success on an infringement claim.

In any event, "the length of the delay, on its own, is not dispositive," *Life After Hate, Inc. v. Free Radicals Project, Inc.*, 410 F.Supp.3d 891, 910 (N.D.Ill. 2019), and "delay is only relevant to the extent that [the movant] lulled the [non-movant] into a false sense of security." *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072, at *26 (N.D.Ill. Sept. 15,

---

[26] *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F.Supp.3d 949, 953 (N.D.Ill. 2018).

2021) (internal quotation marks omitted); *Gardner Bender*, 612 F.2d at 1025 ("delay is only one among several factors to be considered"). There was no such lulling here because Home Chef placed Grubhub on notice that it intended to enforce its rights when it served Grubhub with a cease-and-desist letter on September 7, 2021, a mere two weeks after it learned of the Grubhub Lock-up Logo. *See, e.g., Life After Hate*, 410 F.Supp.2d at 910; *SFG, Inc. v. Musk*, No. 19-CV-02198, 2019 WL 5085716, at *14 (N.D.Ill. Oct. 10, 2019); *Nat'l Customer Eng'g Inc.*, 1997 WL 363970, at *6 (finding that plaintiff did not unduly delay bringing its lawsuit when it first sent a cease-and-desist letter and filed suit within three months after it learned of the alleged infringement).

For these reasons, Home Chef's alleged delay in seeking injunctive relief does not serve to rebut the presumption of irreparable harm in its favor that is created by the Trademark Modernization Act and the factual circumstances of this case.

### C.     The Balance of Harms Favors Home Chef.

Even when irreparable harm to the senior trademark holder has been shown, courts must consider the harm to the junior user and balance that against the harm that the trademark holder will suffer if the injunction does not issue. *Ty, Inc.*, 237 F.3d at 902-03; *A.J. Canfield*, 796 F.2d at 908. In this case, Grubhub does not claim that it will lose any sales or market share, that its good will and brand name will be damaged, or that any of its thousands of restaurant and grocery store partners will cease doing business with it if it is enjoined from using the JET House Logo.[27] *Cf. Johnson Pub. Co. v. Willitts Design Int'l, Inc.*, No. 98 C 2853, 1998 WL 341618, at *9 (N.D.Ill. June 22, 1998) (balance of harms weighed in defendant's favor where it would lose 75 to 80% of its sales and the substantial sums spent marketing and promoting the products in

---

[27] This is not surprising since Grubhub built up its multi-billion-dollar, nationwide business long before it began using the JET House Logo in the fall of 2021.

question, and the injunction would have a "significant negative impact" on its relationships with retail stores, customers, and manufacturers); *SFG, Inc.*, 2019 WL 5085716, at *15 (balance of harms weighed in defendant's favor where defendant would experience damage to its good will and the "catastrophic" harm of being forced to close its restaurant, terminate forty-four employees, deprive multiple vendors and suppliers of considerable business during rebranding, and abandon its plan of establishing a nationwide chain).

Instead, Grubhub asserts that if it were required to discontinue its use of the JET House Logo (which, in turn, would require it to abandon the Grubhub Lock-up Logo, which incorporates the JET House Logo):

> [it] could be forced to spend millions of dollars along with countless company resources (including time spent by hundreds of employees across all Grubhub departments, including without limitation, engineering, product, marketing, sales, and customer care) to remove the Grubhub Lock-up Logo, generate alternate branding, and implement the alternate branding through its digital properties and thousands of marketing and other company assets nationwide.

(Dckt. #46-4 at ¶28).[28] Grubhub further asserts that there is no justification for subjecting it to this burden and that the facts here are remarkably similar to the circumstances in *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300 (N.D.Ill. Jan. 30, 1987), where the parties vied for the exclusive right to use the mark REFRESH to market and sell their respective beverages.

---

[28] Grubhub also asserts that "tens of thousands of restaurants that work with Grubhub could be directly burdened and forced to change their customer-facing marketing materials that feature the Grubhub Lock-up Logo and consumers may be forced to download a new mobile application." (Dckt. #46-4 at ¶30). However, Grubhub does not claim that the restaurants will incur any costs in connection with changing their marketing materials as the restaurateurs might just have to throw the old marketing materials away. (Dckt. #56 at p. 81).

Moreover, Grubhub does not explain why its customers would have to download a new application when Grubhub – according to its August 24, 2021 press release – rolled out the Grubhub Lock-up Logo by including it on Grubhub's *existing* app. (Dckt. #46-4 at p. 29 ("Don't get caught doing a double take when you reach for the Grubhub app today. It's not your eyes – we've officially jumped in feet first to our new orange branding and logo!")).

The decision in *Stokely-Van Camp*, however, is distinguishable for several reasons which help illustrate why the balance of harms weighs in favor of Home Chef in this case.

First, the parties began to use the mark REFRESH to market and sell their beverages during roughly the same time period (late 1985 through May 1986) and plaintiff failed to show that it was "fairly clear cut that it was the first to use the mark in a manner which establishes superior rights in a mark." *Stokely-Van Camp*, 1987 WL 6300 at *1, 3. Moreover, the plaintiff had undertaken a "much less extensive" marketing program than defendant Coke and had placed its future plans regarding the mark and its beverage "on hold" at the time the preliminary injunction proceedings were conducted. *Id.*, at *2. In this case, by contrast, Home Chef had federal registrations for the HC House Mark and, since 2014, it has spent over $450 million on marketing and advertising featuring the HC House Mark. Furthermore, Grubhub – which tried and failed to get a federal registration for the JET House Logo – incorporated the JET House Logo into the Grubhub Lock-up Logo as part of its marketing and advertising seven years later, in the fall of 2021.

Second, the plaintiff in *Stokely-Van Camp* knew beforehand that Coke was about to launch a product with the same name as its own beverage, yet it took *no* action to notify Coke of its potentially infringing actions for three months. *Stokely-Van Camp*, 1987 WL 6300, at *3. In the meantime, Coke was spending substantial amounts to market its product. *Id.* In this case, Home Chef knew that the USPTO had rejected JET's effort to register the JET House Logo, but had no idea that Grubhub nonetheless intended to use the JET House Logo as part of its new marketing and branding strategy until it received Grubhub's August 2021 press release announcing the roll out of the Grubhub Lock-up Logo. Home Chef researched the issue and sent Grubhub a cease-and-desist letter two weeks later. In sum: the plaintiff in *Stokely-Van Camp*

had the opportunity to both possibly stop the alleged infringement *before* it actually occurred and to stop Coke from incurring the marketing and advertising expenses that helped swing the balance of harms in Coke's favor. Home Chef had no such opportunities here.

Third, Coke did not know that the plaintiff had begun to market and sell a REFRESH beverage at the time it began to market and sell its own REFRESH beverage. By contrast, Grubhub knew before it launched the Grubhub Lock-up Logo that the USPTO had rejected JET's effort to register the JET House Logo after finding a likelihood of confusion between that mark and the HC House Mark (both with and without the HOME CHEF brand name). Nonetheless, rather than appealing the USPTO's finding or attempting to register the Grubhub Lock-up Logo with the USPTO, Grubhub went ahead and rolled out its Lock-up Logo.

The Seventh Circuit and courts from this District have repeatedly discounted the alleged harm that alleged infringers claim where – as here – they had "full knowledge" of a senior user's trademark and still chose to "proceed[] in the face of a known risk." *Ty, Inc.*, 237 F.3d at 903; *Wesley-Jessen*, 698 F.2d at 867 (having failed to comply with its duty to select a trademark that will avoid confusion, defendant "cannot now complain that having to mend its ways will be too expensive") (internal quotation marks omitted); *Lettuce Entertain You Enterprises, Inc. v. Leila Sophia AR, LLC*, 703 F.Supp.2d 777, 791 (N.D.Ill. 2010) ("[W]hen assessing the harm to the alleged infringer, the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.") (internal quotation marks omitted); *TV Land*, 908 F.Supp. at 554 ("We consider that the Defendants knew of the Plaintiffs' stores as early as February 1992, and they knew of Plaintiffs' mark as early as June 1995, so they knowingly risked many of the harms they now face. On balance, we find that the Plaintiffs face greater harms.").

Finally, if Coke had been enjoined in *Stokely-Van Camp*, it would have been forced to suspend all sales of its beverage while changing the names on all existing products, advertisements, promotionals, and programs and lost good will as a consequence. *Stokely-Van Camp*, 1987 WL 6300, at \*2. In this case, Grubhub does not claim that an injunction forcing it to remove the JET House Logo from its advertising and marketing materials will shut down its business or otherwise interrupt its operations. Instead, Grubhub claims that it will incur unspecified "millions of dollars" of expenses to rebrand after removing the Grubhub Lock-up Logo from its digital properties, marketing, and other company assets. (Dckt. #46-4 at ¶8). While such rebranding costs are a consideration,[29] it is clear that Grubhub's multi-billion-dollar operation won't skip a beat if the injunction Home Chef seeks is entered. *See A.J. Canfield*, 796 F.2d at 909 (finding that balance of harms favored the mark holder where an injunction forcing the alleged infringer to stop using the contested mark "will not affect the continued success of the company").

Because Home Chef has made a "strong showing" that it is likely to prevail on the merits of its trademark infringement claim, the balance of harms would need to lean toward Grubhub to warrant denial of injunctive relief under the Seventh Circuit's "sliding scale" approach. *See, e.g., Cassell v. Synders*, 990 F.3d 539, 545 (7th Cir. 2021); *Mechling*, 2021 WL 3910752, at \*8. In consideration of the circumstances and the precedent cited above, the Court finds that the harm that Home Chef will suffer if injunctive relief is denied outweighs the harm Grubhub will suffer if injunctive relief is granted and it is required to incur the alleged rebranding costs.

---

[29] *See Polar Corp. v. PepsiCo., Inc.*, 789 F.Supp.2d 219, 240 (D.Mass. 2011) ("Rebranding costs should be balanced against the harm to plaintiff if an injunction does not issue").

### D. The Public Interest Favors the Grant of Injunctive Relief.

Courts also consider the public interest when determining whether to grant injunctive relief. *Life Spine, Inc.*, 8 F.4th at 539. "Enforcement of trademark law serves the public interest by reducing consumer confusion." *SFG, Inc.*, 2019 WL 5085716, at \*16; *Mechling*, 2021 WL 3910752, at \*8. "Thus, in trademark cases, the public interest almost always favors granting otherwise appropriate injunctions." *Polar Corp.*, 789 F.Supp.2d at 240. Home Chef has made a strong showing of a likelihood of consumer confusion and that is enough to demonstrate that the public interest weighs in favor of the entry of an injunction. *Id.*; *Mechling*, 2021 WL 3910752, at \*8; *H-D, U.S.A., LLC v. Partnerships & Unincorporated Ass'ns Identified on Schedule A*, No. 21 C 3581, 2021 WL 4459472, at \*4 (N.D.Ill. Sept. 24, 2021).

### E. Bond

Federal Rule of Civil Procedure 65, provides in relevant part:

> **(c) Security.** The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c) (emphasis added); *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F.Supp.3d 427, 441 (N.D.Ill. 2019) ("Because USA Halal is entitled to preliminary relief, we must consider the appropriate security that USA Halal should be required to post.").

The burden of establishing the bond amount rests with Grubhub, the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint, and the district court sets the bond in its discretion. *Monster Energy Co. v. Wensheng*, 136 F.Supp.3d 897, 910–11 (N.D.Ill. 2015) (citing Fed. R. Civ. P. 65(c); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994). The Seventh Circuit has cautioned district courts to "err on the high side" because "the damages for an erroneous

preliminary injunction cannot exceed the amount of the bond." *Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*, No. 20-CV-3471, 2020 WL 6119516, at *18 (N.D.Ill. Oct. 16, 2020), *quoting Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000); *see also Ty, Inc.*, 292 F.3d at 516 ("The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits.").

Unfortunately, neither party has addressed the question of what would be an appropriate bond if the District Court adopts this Court's recommendation and enters a preliminary injunction. Moreover, Grubhub's evidence as to the rebranding costs that it would incur if an injunction were granted is too vague to provide this Court with a sufficient basis to make a bond recommendation. *Cf. Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *15–16 (N.D.Ill. June 10, 2015) (setting bond after consideration of alleged infringer's evidence regarding its rebranding costs). If the District Court agrees that the issuance of a preliminary injunction is warranted, this Court recommends that the parties be permitted to submit supplemental briefing as to the appropriate bond. *See Scholle Corp. v. Rapak LLC*, No. 13 C 3976, 2014 WL 3687734, at *2 (N.D.Ill. July 24, 2014) (ordering parties to submit position papers concerning the appropriate bond where neither party had addressed the issue of bond in their filings leading up to or at the preliminary injunction hearing).

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the District Court grant defendants' motion for preliminary injunction (Dckt. #17), and enter the following order enjoining:

Plaintiffs Grubhub Inc. and Takeaway.com Central Core B.V., their officers, agents, servants, employees, subsidiaries, parents, affiliates, related entities, suppliers,

customers, successors, assigns and attorneys, and those acting in concert with, by or

through them, from using in the United States, the trademark  and any similar

variation thereof, with or without any accompanying or allegedly distinguishing wording,

on or in connection with any and all goods and services, and in any and all advertising,

promotions, and marketing thereof.

Specific written objections to this Report and Recommendation shall be served and filed within

14 days from the date that this order is served.  Fed.R.Civ.P. 72.  Failure to file objections with

the District Court within the specified time will result in a waiver of the right to appeal all

findings, factual and legal, made by this Court in the Report and Recommendation.  *Lorentzen v.*

*Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).


**DATED:**        **April 8, 2022**


**Jeffrey I. Cummings**
**United States Magistrate Judge**